IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| EDWARD L. JENKINS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION NO. 2:08-CV-0164-KOB |
| | ) |
| MICHAEL J. ASTRUE, Commissioner, | ) |
| Social Security Administration, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION**

**I. Introduction**

The claimant, Edward L. Jenkins, filed an application for disability insurance benefits and supplemental security income payments on February 10, 2004, alleging disability commencing on May 25, 2003, due to complications arising from HIV infection, including anxiety and depression. The Commissioner denied the claims on May 20, 2004. The claimant requested a hearing before an Administrative Law Judge. The ALJ held a hearing on April 24, 2006. In a decision dated July 21, 2006, the ALJ found that the claimant was not disabled within the meaning of the Social Security Act and, therefore, was not eligible for SSI or DIB payments. The claimant then applied to the Appeals Council for review.  On November 30, 2007, the Appeals Council denied the claimant's request for review. This denial constituted the final decision of the Commissioner of Social Security. The claimant has exhausted his administrative remedies, and the case is now before the court for judicial review under 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, the court will AFFIRM the decision of the Commissioner. The

1

court will enter a separate order to that effect contemporaneously.

## II. Issues Presented

In this appeal, the claimant argues that the Commissioner erred in two ways. First, the claimant alleges that the ALJ's opinion was not based upon substantial evidence, because he failed to properly consider and evaluate the opinions of examining and non-examining physicians. Second, the claimant asserts that the ALJ failed to properly apply the three-part pain standard when considering his subjective complaints.

## III. Standard of Review

The standard for reviewing the Commissioner's decision is limited. Under this limited standard of review, this court will not decide the facts anew, make credibility determinations, or re-weigh the evidence. Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005). This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if his factual conclusions are supported by substantial evidence. See 42 U.S.C. § 405(g) (2000); Graham v. Apfel, 129 F.3d 1420, 1422 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).

However, "no . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." Walker, 826 F.2d at 999. This court does not review the Commissioner's factual determinations de novo, but the Commissioner's factual findings must be supported by substantial evidence. Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 401 U.S. 389, 401 (1971). The court must

"scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." Walker, 826 F.2d at 999. Furthermore, a reviewing court must not only look to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence on which the ALJ relied. Hillsman v. Bowen, 804 F.2d 1179, 1180 (11th Cir. 1986).

### IV. Legal Standard

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) (2000). To make this determination, the Commissioner employs a five-step, sequential evaluation process:

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. pt. 404, subpt. P, app. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above question leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

McDaniel v. Bowen, 800 F.2d 1026, 1030 (11th Cir. 1986); see also 20 C.F.R.§§ 404.1520, 416.9201 (2008).

"An administrative law judge must accord 'substantial' or 'considerable' weight to the opinion of a claimant's treating physician unless 'good cause' is shown to the contrary."

Broughton v. Heckler, 776 F.2d 960, 961-962 (11th Cir. 1985). "The law is clear that, although the opinion of an examining physician is generally entitled to more weight than the opinion of a non-examining physician, the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." Sryock v. Heckler, 764 F.2d 834, 835 (11th Cir. 1985) (citing Oldham v. Schweiker, 660 F.2d 1078 (5th Cir. Unit B. 1981)). The ALJ, however, must "state with particularity the weight [given to] different medical opinions and the reasons therefor." Sharfarz v. Bowen, 825 F.2d 278, 279 (11th Cir. 1987) (citing MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986)).

In evaluating pain and other subjective complaints, the Commissioner must consider whether the claimant demonstrated an underlying medical condition, and either

> (1) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (2) that the objectively determined medical condition is of such a severity that it can reasonably be expected to give rise to the alleged pain.

Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir.1991); see also Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002); 20 C.F.R. § 404.1529.

**V. Facts**

The claimant was thirty-eight years old at the time of the administrative hearing and has a ninth grade education. (R. 19). His past work experience includes employment as a maintenance worker, fast food worker, floor waxer, general laborer, and cleaner. According to the claimant, he became disabled on May 25, 2003, due to complications arising from HIV infection, including anxiety and depression. (R. 19, 26). The claimant has not engaged in substantial gainful employment since May 25, 2003, though he has worked as a janitor for 15 hours per week since

February 2006. His earnings from this part-time work are below the minimum amount required to constitute substantial gainful activity under 20 C.F.R. §§ 404.1574(b)(3) and 416.974(b)(3). (R. 19).

According to the medical records, Dr. Jane Mobley diagnosed the claimant as having stage A2 human immunodeficiency virus (HIV) on April 22, 2003. (R. 189). Dr. Mobley's report from this visit also indicated that the claimant was an active cocaine user. The claimant reported to Dr. Mobley that he was placed on Zoloft previously, but that he self-discontinued the medication after one dose. (R. 189).

During a visit to the Cooper Green Hospital Emergency Room on June 8, 2003, the claimant complained of palpitations, a rapid, irregular heartbeat, and anxiety. (R. 115). Based upon the results of an electrocardiogram and a urinalysis, which was positive for cocaine, the claimant was diagnosed as having atrial fibrillation secondary to cocaine abuse and was instructed to stop using cocaine. (R. 115).

During a visit to Dr. Mobley on July 15, 2003, the claimant complained of weight loss, secondary to not being able to buy enough food. Dr. Mobley's report also stated that the claimant has anxiety and a substance abuse problem. Dr. Mobley prescribed Neurontin for the claimant's anxiety and stated that the claimant was in treatment for his substance abuse problem.  Dr. Mobley diagnosed the claimant as having a stage 2 HIV infection. During stage 2 of an HIV infection, a patient is largely free from any symptoms, but might have swollen glands. The claimant had a CD4 count of 418 and a viral load of 56,000. (R. 110). CD4 cells can fight against infections and end an immune response. A low CD4 count indicates a weakened immune system. A viral load test is used to measure the amount of HIV virus in the blood.

During a visit to Cooper Green Hospital Medicine Clinic, on July 31, 2003, the claimant was diagnosed with transient arrhythmia, likely cocaine induced, which was resolving in sinus rhythm. The clinic physician noted that the claimant was counseled to abstain from using cocaine. (R. 113).

During a visit to Dr. Mobley on August 12, 2003, the claimant said that he was depressed because he had no income or food. The claimant refused treatment for his HIV infection. (R. 109). At a follow up appointment with Dr. Mobley on December 9, 2003, the claimant stated he felt well and had no complaints. (R. 107).

During a visit with Dr. Mobley on February 3, 2004, Dr. Mobley found that the claimant's viral load was 26,000. The claimant's CD4 count was 248, compared to a count of 418 the previous July. Dr. Mobley had a discussion with the claimant about starting antiviral therapy, but the claimant told Dr. Mobley that he did not want to start treatment at that time. Dr. Mobley discussed with him the risks of CD4 dropping below 200 and the risks of developing an AIDS defining illness. The claimant continued to refuse treatment but agreed to discuss treatment during his next visit. (R. 105). During five subsequent visits with Dr. Mobley over the next two years, the claimant continued to refuse treatment for his HIV infection. (R. 157, 246, 237, 235, 229).

On April 14, 2004, the claimant saw Christina Sparks, Ph.D., a psychologist, for a consultative evaluation. Dr. Sparks' report indicates that the information obtained came from the claimant and that the claimant's medical records were unavailable. During Dr. Sparks' evaluation, the claimant reported "worsening symptoms of depressed and anxious mood over the last few months without any identifiable precipitating cause." (R. 131). Nevertheless, Dr. Sparks

observed the claimant as being alert and fully oriented with fair concentration and reasoning abilities and adequate short and long term memory. In the "Diagnostic Impressions" section of her report, Dr. Sparks assessed the claimant as having polysubstance dependence, in full remission per patient report; post-traumatic stress disorder; major depression with psychotic features, severe; and a global assessment of functioning of only 35 out of 100. In the "Recommendations" section, Dr. Sparks suggested that the claimant should be evaluated for possible management of his anxiety and depression with medication.

Dr. Sparks concluded that the claimant's anxiety, depression, anger, distrust, and other psychiatric issues would make it quite difficult for him to respond appropriately to supervision, coworkers, and work pressures in a typical work setting. Dr. Sparks also stated that the claimant did not appear to have good work judgment, but she suggested that if he "was psychiatrically more stabilized and if within any medically determined limitations he might be able to do simple tasks, especially if little social interaction was needed." (R. 132). She noted that the claimant seemed cognitively able to follow simple directions, but that he reported increasing deficits in memory, attention, and concentration. (R. 133).

During a visit with Dr. Mobley on September 29, 2004, the claimant complained of several days of nasal congestion, yellow rhinorrhea, and a cough with white sputum. Dr. Mobley found that the claimant had a CD4 count of 360 and a viral load of 99,000. The claimant continued to refuse treatment for his HIV infection. Dr. Mobley prescribed Doxy and Drexoral for the claimant's nasal infection. (R. 157).

During a visit with Dr. Mobley on May 4, 2005, the claimant complained of diarrhea. The claimant had a CD4 count of 260 and a viral load of 41,000. Dr. Mobley prescribed Imodium to

deal with the diarrhea and the patient continued to refuse antiretroviral therapy. (R. 246).

On May 14, 2004, Dr. Peter M. Sims, a state agency psychiatrist, reviewed the medical evidence of record and Dr. Sparks' exam and opinion. In his discussion of the medical evidence of record (MER), Dr. Sims stated that "despite the claimant's claims of severe psychiatric signs and symptoms . . ., the MER does not document these signs and symptoms as being severe." (R. 147). Dr. Sims stated that Dr. Sparks appeared to base her diagnosis of post-traumatic stress disorder on the claimant's report that he has nightmares and flashbacks about past criminal and gang-related activities. Dr. Sims then noted that these signs and symptoms were not reported anywhere else in the medical evidence of record. Dr. Sims also noted that the claimant reported other depressive signs and symptoms to Dr. Sparks that were not mentioned anywhere else in the medical record. Dr. Sims wrote that he was not sure why Dr. Sparks diagnosed "psychotic features." (R. 148).

In the "Conclusions" section of his notes, Dr. Sims stated that the medical evidence of record supported a diagnosis of depression. Dr. Sims stated that Dr. Sparks' diagnosis of major depressive disorder, severe with psychotic features did not appear to be justified. Dr. Sims also wrote that the medical evidence supported a diagnosis of anxiety instead of post-traumatic stress disorder. Dr. Sims concluded that the medical evidence suggested that the claimant has a personality disorder and that the claimant's allegations of anxiety and depression were consistent with the medical evidence of record and fully credible. Dr. Sims also concluded that the claimant's allegations of marked and severe functional impairment caused by his ailments were not consistent with the medical evidence of record and, thus, not fully credible. Dr. Sims stated that the claimant's functional impairment from psychiatric signs and symptoms appeared to be a

3 in intensity on a 6-point scale. (R. 148).

Based on the MER, Dr. Sims marked boxes in Section I of the Mental Residual Functional Capacity Assessment indicating that the claimant had a markedly limited ability to interact appropriately with the general public, a markedly limited ability to accept instructions and respond appropriately to criticism from supervisors, and a markedly limited ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (R. 150). In Section III of the Mental Functional Capacity Assessment, Dr. Sims noted that "the claimant reports limitations with his attention, concentration, and pace. Despite these limitations, however, the claimant can maintain attention sufficiently to complete simple, 1- to 2-step tasks for periods of at least 2 hours, without the need for special supervision or extra rest periods." Dr. Sims stated that the claimant is "likely to miss 1-2 days of work per month due to his psychiatric signs and symptoms," but that he could otherwise "maintain work attendance within customary expectations." Dr. Sims also found that "the claimant has psychiatric signs or symptoms that impair his interpersonal functioning and may adversely affect his work performance. These include social discomfort, distrust of others, and irritability."

Dr. Sims stated that "the claimant's signs and symptoms may adversely affect his ability to adapt to changes in the work environment, although not to a marked extent." He went on to suggest that "changes in work environment or expectations should be infrequent and introduced gradually." Dr. Sims also wrote that "the claimant can set simple, short-term work related goals that are realistic but may need assistance with those that are more complex or long-term." (R. 152).

On a visit to Dr. Mobley on June 6, 2005, the claimant complained of a poor appetite and

difficulty gaining weight. Dr. Mobley prescribed a trial of 20 cubic centimeters of Megace per day. (R. 245). Megace is used to stimulate a patient's appetite. During a visit to the Cooper Green Hospital Emergency Room on July 7, 2005, the claimant was diagnosed as having a gluteal abscess of 3 centimeters in diameter on his right buttock. The wound was cleaned and treated with Keflex. (R. 241).

During a visit with Dr. Mobley on August 25, 2005, the claimant's CD4 count was 260 and his viral load was 33,000. The claimant continued to refuse antiretroviral therapy. (R. 237). On a visit with Dr. Mobley on November 8, 2005, the claimant stated that he felt well and had no complaints. On that date, the claimant had a CD4 count of 260 and a viral load of 33,000. The claimant was still not interested in antiretroviral therapy. (R. 235).

During an examination by Dr. Bruce W. Romeo, an internist, on November 30, 2005, the claimant complained of feeling fatigued, frequent colds, diarrhea, and breathing problems. The claimant stated that he smoked a pack of cigarettes every 3 days, but that he had quit using alcohol and cocaine in 2001. (R. 220). During the examination, all of the claimant's ranges of motion were completely normal. (R. 222). Dr. Romeo found that the claimant had 5/5 strength throughout the examination, and his report stated that the claimant could constantly lift and carry 10 pounds, frequently lift and carry 20 pounds, and occasionally lift and carry 30 pounds. (R. 222, 226). Dr. Romeo also found that the claimant was not limited in his ability to sit, stand, walk, push, pull, climb, balance, stoop, kneel, crouch, crawl, handle, finger, feel, talk, hear, or reach overhead. (R. 226).

During a hearing held by the ALJ on April 24, 2006, the claimant testified that he had not used any illegal drugs since 1996. (R. 262, 264). The claimant stated that he could not work full

time, because he becomes tired very quickly, his feet begin to hurt after a certain amount of time, and when he tries "to do a lot" he slows down and his body feels like it will shut down. (R. 157). The claimant stated that he can walk or stay on his feet for 45 minutes to an hour, but then must sit and rub his feet and legs. (R. 258, 267). The claimant estimated that he can lift a maximum of 20 pounds. (R. 258). He testified that the act of bending can cause him problems "every now and then." (R. 259). The claimant testified that because of his depression, he thinks about suicide a lot and loses motivation to leave his room. (R. 261). The claimant also stated that when he is in public, he feels other people are out to get him. (R. 163). When the ALJ asked the claimant if he was taking any medications for depression, he replied that he was not. The claimant explained that, although his doctor had prescribed Zoloft, he stopped taking it because it bothered his stomach "a little bit." (R. 265). The claimant testified that he was last hospitalized in 2003 and that the only doctor who treats him is Dr. Mobley, whom he visits monthly. (R. 268).

During the hearing, the ALJ presented Dr. Julia Russell, a vocational expert, with a hypothetical that assumed a young individual with a limited education; a borderline IQ; mild to moderate pain, depression, and fatigue; the ability to occasionally climb, push, or pull involving his lower extremities; and the ability to sit and/or stand at his option. (R. 172). Dr. Russell stated that such an individual would be unable to perform medium work given the limitations in the ALJ's hypothetical, specifically the necessity for a sit/stand option. (R. 273). However, Dr. Russell said that someone with the conditions mentioned in the hypothetical would be able to perform light work. (R. 273). Dr. Russell stated that at both the light and sedentary levels of exertion, 2,000 to 3,000 bench work positions, 3,000 to 4,000 automatic machine tender positions, and 3,000 to 5,000 cashier positions are available in the state of Alabama. (R. 274). Dr.

Russell testified that moderately severe to severe fatigue, depression, or pain would preclude even light work. (R. 275-276). Dr. Russell also testified that work as a cashier would be precluded if an individual was limited to working around things as opposed to working in and around the general public. (R. 277).

The claimant's attorney asked Dr. Russell what impact a marked impairment in ability to respond to supervisors and coworkers, and a marked impairment in ability to handle customary work pressures would have on an individual's ability to work. Dr. Russell responded that such limitations would rule out all work. (R. 277).

The ALJ found that the claimant has the "severe" impairments of anxiety, stage A2 human immunodeficiency virus, a history of atrial fibrillation secondary to cocaine abuse; a history or transient arrhythmia, which was likely cocaine-induced; and polysubstance abuse. (R. 28). The ALJ concluded that "the claimant does not have an impairment or combination of impairments, which meets or equals a Listing of Impairment in Appendix 1 to Subpart P, 20 CFR, Part 404." (R. 25). The ALJ stated that he was reviewing the claimant's subjective complaints in accordance with Social Security Regulations and the three-part pain standard. (R. 25).

The ALJ stated that the medical evidence of record failed to corroborate the severity of the claimant's complaints of fatigue, anxiety, and depression. (R. 26). The ALJ noted that the claimant had refused treatment for his HIV infection, and that to receive benefits a claimant must follow treatment prescribed by a physician if such treatment can restore his ability to work. (R. 26). The ALJ found Dr. Sims' assessment of the claimant's mental impairments more persuasive than that of Dr. Sparks. The ALJ justified this conclusion by noting that, contrary to Dr. Sparks'

assessment, the medical evidence of record does not show the claimant to have psychotic features. He also explained that the claimant's reports of increasing deficits in memory were not evident in the mental status examination conducted by Dr. Sparks. The ALJ also stated that the claimant's ability to work 15 hours a week as a night janitor was inconsistent with Dr. Sparks' global assessment of functioning of only 35. (R. 26).

The ALJ explained that the claimant's allegations of disabling restrictions were suspect, because the claimant testified that he had not used cocaine since 1996, but he had a urine test that returned positive for cocaine in 2003. The ALJ also noted that the claimant gave evasive and contradictory reasons for canceling a psychological consultative examination appointment. The claimant told Dr. Sims that he cancelled the examination because he had an important appointment, which Dr. Sims found surprising because the claimant reported that he is afraid of people, secluded, and withdrawn. The claimant then told Dr. Sims that he had to meet with his probation officer, but then could not identify his probation officer. The claimant finally told Dr. Sims that he did have to meet with his probation officer after all. The ALJ also noted that the claimant told Dr. Sparks that he had no friends, yet a friend accompanied him to his evaluation by her. (R. 26-27).

The ALJ concluded that the claimant retains the residual functioning capacity to perform light work, which allows for a borderline IQ; a sit/stand option; working primarily with things as opposed to the general public; and occasional bending, stooping, squatting, or pushing/pulling with the upper extremities. The ALJ stated that the claimant's pain, fatigue, depression, and anxiety are reasonably expected to impose no greater than mild to moderate functional limitations on his ability to engage in basic work activities, and that any testimony to the contrary

was not credible because it was inconsistent with the medical evidence of record. (R. 27).

The ALJ determined that based on the vocational expert's testimony, the claimant would be unable to perform his past work, but that he could perform light and sedentary jobs that exist in significant numbers in Alabama. The ALJ concluded, therefore, that the claimant is not disabled. (R. 27-28).

## VI. Discussion

### A. Consideration of the Medical Evidence of Record

The claimant contends that the ALJ failed to properly consider and evaluate the opinions of examining and non-examining physicians. Specifically, the claimant contends that the ALJ should have given greater weight to the findings and diagnoses of Dr. Sparks. The claimant also contends that the ALJ substituted his opinion for that of the medical experts, ignored all medical evidence of record, and mischaracterized Dr. Sims' opinion. The Commissioner asserts that the ALJ properly weighed the evidence and considered the medical record as a whole.

"An administrative law judge must accord 'substantial' or 'considerable' weight to the opinion of a claimant's treating physician unless 'good cause' is shown to the contrary." Broughton v. Heckler, 776 F.2d 960, 961-962 (11th Cir. 1985). "The law is clear that, although the opinion of an examining physician is generally entitled to more weight than the opinion of a non-examining physician, the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." Sryock v. Heckler, 764 F.2d 834, 835 (11th Cir. 1985) (citing Oldham v. Schweiker, 660 F.2d 1078 (5th Cir. Unit B. 1981)). The ALJ, however, must "state with particularity the weight [given to] different medical opinions and the reasons therefor." Sharfarz v. Bowen, 825 F.2d 278, 279 (11th Cir. 1987) (citing MacGregor v. Bowen,

786 F.2d 1050, 1053 (11th Cir. 1986)).

The ALJ here clearly stated that he found Dr. Sims' nonexamining, reviewing assessments of the claimant's mental impairments to be more persuasive than those of Dr. Sparks, an examining physician. The ALJ provided three specific reasons for his decision to give Dr. Sims' assessment greater weight. First, the ALJ noted that "the claimant reported increasing deficits in memory, but they were not evident on his mental status examination" performed by Dr. Sparks on April 14, 2004. Second, he also explained that the medical record did not show the claimant to have psychotic features, despite the conclusion of Dr. Sparks, who made her assessment based exclusively upon the claimant's reports. Third, the ALJ also found that the "claimant's demonstrated ability to work as a night janitor for 15 hours per week is clearly inconsistent with Dr. Sparks assessment that the claimant has a global assessment of functioning of only 35." The claimant began to work as a part-time night janitor in February 2006, and the ALJ noted that the claimant was not working as a janitor when he was evaluated by Dr. Sparks in April 2004. The ALJ examined the entire record, including the assessments of Dr. Sparks and Dr. Sims. He clearly explained that he found Dr. Sims' assessment to be more persuasive and gave three explicit reasons why. The court, therefore, finds that the ALJ properly weighed the opinions of the examining and nonexamining physicians, and that his conclusion was based on substantial evidence in the record.

The claimant also alleges that the ALJ erred by ignoring and mischaracterizing Dr. Sims' opinion. Specifically, the claimant asserts that Dr. Sims believed that the "plaintiff had a markedly limited ability to interact appropriately with the general public; a 'marked' limitation inability to accept instructions and respond appropriately to criticism from supervisors; 'marked'

inability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes." The claimant also asserts that Dr. Sims "indicated that Plaintiff would have a 'marked' difficulty in maintaining social functioning." The claimant bases his assertion on boxes that Dr. Sims checked off in Section I of the Mental Residual Functional Capacity form. However, the Program Operations Manual System (POMS) states that "Section I is merely a worksheet to aid in deciding the presence and degree of functional limitations and the adequacy of documentation and does not constitute the RFC assessment." POMS § DI 24510.060B4. The "actual mental RFC assessment" is recorded in Section III. POMS § DI 24510.060B4.

     In Section III, Dr. Sims stated that despite the claimant's reported limitations, he can maintain attention sufficiently to complete simple 1- to 2-step tasks for periods of at least two hours. He also stated that the claimant is likely to miss 1-2 days of work per month due to his psychiatric signs and symptoms, but can otherwise maintain work attendance. Dr. Sims found that the claimant has psychiatric signs and symptoms including social discomfort, distrust of others, and irritability that impair his interpersonal functions and may adversely affect his work performance. He stated that while the claimant's sign and symptoms may adversely affect his ability to adapt to changes in the work environment, they would not affect his ability to adapt to a marked extent. The assessment in Section III is more reliable because it is a detailed explanation of limitations in understanding and memory, sustained concentration and persistence, social interaction, and adaptation. Section III is intended to explain how mental limitations indicated in Section I would affect the claimant in a work setting. Section III also includes any other information that is necessary to present a complete picture of the claimant's Residual Functional Capacity. The court finds that the ALJ was correct in reviewing the whole record, and not just

Section I of the Mental RFC Assessment form. The court concludes that the ALJ did not commit reversible error in his consideration of Dr. Sims' assessment of the claimant.

**B. Application of the Three-Part Pain Standard**

The claimant contends that the ALJ improperly applied the three-part pain standard when considering his subjective complaints of depression and fatigue. The government responds that the ALJ properly determined that the claimant's subjective complaints were not credible.

A three-part pain standard applies when a claimant attempts to establish disability through his or her own testimony of pain or other subjective symptoms. This standard requires "(1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can be reasonably expected to give rise to the claimed pain." Wilson v. Barnhardt, 284 F.3d 1219, 1225 (11th Cir. 2002); see also Kelley v. Apfel, 185 F.3d 1211, 1215 (11th Cir. 1999); Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991). "The ALJ does not have to recite the pain standard word for word, rather the ALJ must make findings that indicate that the standard was applied." Holt, 921 F.2d at 1223. This "standard also applies to complaints of subjective conditions other than pain." Id. "[A] claimant's subjective testimony supported by medical evidence that satisfies the standard is itself sufficient to support a finding of disability." Id. "Generally, credibility determinations with respect to the subjective testimony of a claimant are reserved to the ALJ." Johns v. Bowen, 821 F.2d. 551, 557 (11th Cir. 1987). If the ALJ "decides not to credit such testimony, he must discredit it explicitly . . . and articulate explicit and adequate reasons for doing so . . . . Failure to articulate the reasons for discrediting subjective pain testimony requires, as a matter of law, that the testimony be accepted as true." Brown v.

Sullivan, 921 F.2d 1233, 1236 (11th Cir. 1991). "The credibility determination does not need to cite 'particular phrases or formulations' but it cannot merely be a broad rejection which is 'not enough to enable [the district court or this Court] to conclude that [the ALJ] considered [the claimant's] medical condition as a whole.' " Dyer v. Barnhart, 395 F.3d 1206, 1210-1211 (11th Cir. 2005) (citing Foote v. Chater, 67 F.3d 1553, 1561 (11th Cir. 1995)). The ALJ may consider a claimant's daily activities in evaluating and discrediting complaints of disabling pain. Harwell v. Heckler, 735 F.2d 1292, 1293 (11th Cir. 1984).

This court has already concluded that the ALJ's assessment of the medical evidence was based upon substantial evidence in the record. This court also finds that the ALJ provided explicit reasons based on substantial evidence in the record for discrediting the claimant's subjective pain testimony. The ALJ explicitly stated that he was applying the pain standard. Although the ALJ found that the claimant had the "severe" impairments of anxiety, depression, stage A2 HIV, history of atrial fibrillation secondary to cocaine abuse, and a history of polysubstance abuse, he concluded that "the evidence as a whole fails to confirm disabling limitations arising from the claimant's impairments, and his impairments are not of such severity that they could reasonably be expected to give rise to disabling limitations." The ALJ provided explicit reasons for this conclusion.

The ALJ did find that the claimant had the severe impairment of HIV, but had repeatedly refused treatment against advice of physicians. Refusal to follow prescribed medical treatment without a good reason will preclude a finding of disability. 20 C.F.R. § 404. 1530(b), [20 C.F.R. § 416.930(b)]; see also Ellison v. Barnhart, 355 F.3d. 1272, 1275 (11th Cir. 2003). The ALJ found that the claimant had offered no acceptable reasons for refusing treatment and these

refusals undermined the credibility of the claimant's allegations of disabling fatigue, anxiety, and depression resulting from his HIV infection.

The ALJ noted Dr. Sims' finding that the medical evidence of record indicated that the claimant did not have psychotic features. The ALJ also noted Dr. Sims' finding that the mental status examination provided no evidence to support the claimant's reports of memory deficits. The ALJ, therefore, determined that while the claimant has a "marked limitation of his ability to maintain social functioning," his "mental impairments, when considered in combination, impose a moderate limitation of his daily activities; a moderate limitation of his ability to maintain concentration, persistence, or pace; and no extended duration episodes of decompensation in work settings." (R. 26).

The ALJ also found that the claimant lacked credibility, noting that the record contained several inconsistent statements by the claimant. The claimant testified that he had not used cocaine since 1996, but a June 2003 urine test returned positive for cocaine, and cocaine use was described as the likely cause of transient arrhythmia in July 2003. The ALJ also noted that the claimant gave Dr. Sims evasive and contradictory explanations when he cancelled a psychiatric consultative examination. The court finds that the ALJ properly applied the pain standard and assessed the claimant's credibility by providing explicit and adequate reasons for discrediting the claimant's subjective testimony. Because these reasons were based upon an examination of the whole record, including medical evidence, the court finds that the substantial evidence in the record supports these reasons.

### VII. Conclusion

For the reasons stated, the court concludes that substantial evidence supports the decision

of the Commissioner and, therefore, will AFFIRM it.

The court will enter a separate order in accordance with this Memorandum Opinion.

DONE and ORDERED this 24th day of June 2009.

_/s/ Karon O. Bowdre_
KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE